JOSEPH FRANKLIN AND HENRY HURLBUT V. PATRICK
TIERNAN.

(Case No. 1067.)

1. APPEAL BOND — MOTION TO DISMISS.— In a suit for land the appeal
   bond was conditioned for the payment of "all costs which may
   have accrued in the district court, and which may accrue in the
   supreme court, and all damages adjudged in said appeal;" and it
   omitted the condition, "for the prosecution of the appeal with
   effect." *Held*,

   (1) That the bond was sufficient to give the court jurisdiction,
   and a motion to dismiss filed after the case had been pending on
   appeal several years was overruled.

2. PRIMA FACIE GOOD TITLE.— Where locations made on Galveston
   Island between August 12, 1870, and May 16, 1871, were patented
   under the provisions of the act of August 19, 1876, *held*,

   (1) That whether the locations were valid or not· when made,
   they were validated by the act of 1876, and that *prima facie* the
   patentees were vested with a good title.

3. PENCIL ENTRIES ADMISSIBLE IN EVIDENCE.— The comptroller, in
   answering interrogatories propounded to him, exhibited certain
   entries in an official book made in pencil. *Held*,

   (1) That these entries should have been admitted in evidence.


APPEAL from Galveston.    Tried below before the Hon.
Wm. H. Stewart.

This suit was brought by Tiernan to recover of appel-
lants two lots on Galveston Island, containing each about
ten acres of land, and known as lots 120 and 125, section
No. 2, on Phelan's map of the original survey of the
island.   The original petition was filed, September 21,
1877, and the amended original petition, which sets out
Tiernan's title, was filed July 15, 1878.   That title was as
follows:

1st.  Certificate for three hundred and twenty acres of
land, issued to Francis Hughes, July 4, 1844.

2d.  Transfer from Hughes to John Lambert, July 4,
1844.

3d.  Sale and transfer of the certificate (and confirmation

of sale) by the administrator of Lambert to Christopher Fox, April 3, 1856.

4th. Transfer from Fox to Tiernan, August 27, 1870.

5th. Patents for those two lots granted to the heirs of John Lambert, deceased, assignee of Francis Hughes, his heirs and assigns, December 1, 1876.

It appeared that on the 27th day of August, 1870, Tiernan filed the certificate with the county surveyor of Galveston county, together with his application for the survey of certain lots, including lots 120 and 125 above mentioned; survey made, etc.

October 5, 1877, answer filed by appellants, consisting of a general demurrer, general denial and a plea of "not guilty."

November 19, 1878, the case was submitted to the court without a jury, and judgment rendered in favor of Tiernan. November 21, 1878, Franklin and Hurlbut filed their motion for a new trial, which was overruled on the 27th, and notice of appeal given in open court. Appeal bond filed December 18, 1878.

Appellants sought to establish a superior title in one James H. Holman or those claiming under him, by reason of a sale of a number of lots, including those in controversy, by the republic of Texas to Holman, and his payment of the purchase money. To prove these facts they offered the deposition of the state comptroller, to which was attached as an exhibit a transcript from one of the record books of his office which had formerly belonged to the treasury department of the republic. This exhibit consisted of a sort of summary statement, ruled into columns from top to bottom. The first column contained the number of lots sold; second, the number of the section; third, the purchasers' names; fourth, amount of purchase; at the top of the fifth column was written, "Paid on lands patented." In the column containing the names of purchasers was the name of James S. Holman as the purchaser of eight lots, including the lots 120

and 125 in controversy. The total amount of the pur-
chase (to wit, $167) was placed directly opposite in the
column headed "Amount of purchase," and also directly
opposite in the column headed "Paid on lands patented."
All the entries in this latter column were written *in
pencil*. Opposite the names of one of the purchasers
was written in this same column of entries, "Paid on
lands patented," these words *in pencil*: "Paid. See
other book;" and the comptroller testified that this "other
book" is not to be found, nor did he know to what book
reference was made. The deposition of the commissioner
of the general land office was also introduced, showing
that a number of the lots corresponding to these pencil
entries had been patented, and giving copies of certificates
from the treasury department upon which the patents
were granted. The entries in pencil were objected to by
appellee, and excluded by the court, on the ground that
records in pencil were incompetent. Defendant Franklin
testified that he was a part owner of the lots and his title
was of record in Galveston county, and had been in
possession by his tenant (the appellant Hurlbut) since
1875; that in 1868 or 1869 he had obtained information
from the comptroller of Holman's title; that a son-in-law
of Holman had promised him an interest in the lots, and
he had relied on the promise; and that before the location
by appellee he had notified Ward, who was associated
with appellee, of Holman's title to the lots. The transcript
was filed in the supreme court February 1, 1879; and the
cause was submitted on briefs of both parties on the 17th
of the same month. February 6, 1882, appellee filed a
motion to dismiss the appeal on account of alleged defects
in the appeal bond.

*George Mason* and *Howard Finley*, for appellee.

I. Against a patent duly issued by the government, a
defense set up and relied upon as a superior claim ema-
nating from the same government, under requirements

of particular laws made to govern particular cases, in order to be made effectual, must show, in all its parts, a strict compliance with all of the provisions of the law. Pasch. Dig., art. 4249; 1 Pars. Con., 375; Rose v. R. R. Co., 31 Tex., 59, 60.

II. Alterations of or additions to the public records of public officers, by *pencil marks*, such as figures made with *pencil*, which may be the mere idle memoranda of some stranger to the record and apparent upon the face of the record, can have no standing in court as evidence in a suit for the title to land. 1 Greenl. Ev., 564; Ricks v. Wofford, 31 Tex., 415; Park v. Glover, 23 Tex., 471.

III. The claim of defendants that the land in controversy had been previously "patented" by the government should be shown by the patent or certified copy thereof, or other evidence from the records of the general land office. Pasch. Dig., art. 4281; Comm'r Gen. Land Office v. Smith, 5 Tex., 479.

IV. After the lapse of nearly forty years without possession, or payment of taxes, or the exercise of any acts of dominion or control, or any certificate or receipt as the law required, or any effort to obtain a patent, the presumption will be that the law and the terms and conditions imposed upon the purchaser were never complied with, and that no right to the land in controversy was ever acquired by defendants. Pasch. Dig., art. 4248 (1829); Dikes v. Miller, 24 Tex., 424.

DELANY, J. COM. APP.— Appellee has filed at this term of the court a motion to dismiss the appeal for the following reasons:

1st. That the bond is not conditioned "for the prosecution of the appeal with effect," nor "for performing the judgment, sentence or decree of the supreme court, in case the decision of said court shall be against the appellant," as is required by Pasch. Dig., art. 1491.

2d. Because the bond as an appeal bond is illegal, void, and absurd, in that it binds the obligors, in any and every event, to pay all the costs of said suit and all the damages that may be adjudged therein.

As this cause had been pending in the supreme court some three years when this motion was filed, no objection to the bond will be considered unless it be such as will defeat the jurisdiction. Rules 8 and 9, Supreme Court. We do not think that the defects of the bond (if there be any) are of that character.

The judgment against appellants was not for a debt or for damages; hence there was no necessity to make provision in the bond for them, as is required by art. 1491. The judgment was simply for the recovery of land and for costs, and hence the bond was required to be given only for "costs of suit and damages on appeal," for which this bond provides in so many words. Pasch. Dig., art. 1492; Britt v. Lowry, 50 Tex., 76. It is usual, no doubt, and proper to insert the condition "on the prosecution of the appeal with effect." But the absence of these words will not vitiate the bond. The motion is therefore overruled.

The title of appellee is evidenced by two patents issued upon a land certificate located upon a part of Galveston Island, just as it might have been located upon any part of the public domain situated on the main land and open to location. Appellee insists that this land, although upon the island, was open to location; that his title is valid, and is supported by recent legislation, which will be considered hereafter.

Appellants contend that the title under which they claim originated in the earlier days of the republic; that among the first acts of legislation were those which separated the islands from the mass of the public domain; that the methods of acquiring title to lands on the islands were entirely different from those by which other lands were

obtained, and that this policy has been perpetuated both by the republic and by the state to the present day. They therefore claim that these lots were not open to location and that appellee's title is void.

A brief review of this legislation will probably not be out of place. On December 9, 1836, the government relinquished to M. B. Menard one league and labor of land on Galveston Island. 1 Laws Rep., pp. 70–71; Pasch. Dig., art. 4228. On the next day, by joint resolution, all the islands belonging to the republic were reserved for the government use, "except the president be authorized specially by congress to sell them." 1 Laws Rep., 76; Pasch. Dig., *supra.* By act of June 12, 1837, the remainder of the island of Galveston was directed to be surveyed into lots of not less than ten nor exceeding forty acres each, the lots to be sold at auction to the highest bidder, one-fourth part of the purchase money to be paid in cash, and the remainder in three equal installments of three, six and nine months. It was further provided, that, upon failure by the purchaser to pay any one of the installments, the land should revert to the government. This sale was directed to take place on the second Monday in November, 1837; so that all the installments must have become due in the course of the year 1838. 1 Laws Rep., p. 267; 1 Pasch. Dig., p. 708.

But by joint resolution of May 9, 1838, the president of the republic and the commissioner of the general land office were authorized and required to issue titles to purchasers of lots on Galveston Island, "provided that said purchasers shall deliver to the commissioner a certificate of purchase, with a receipt for the payment of the purchase money in full, from the secretary of the treasury." Pasch. Dig., art. 4249.

It has been held that the provisions of this joint resolution dispensed with the forfeitures denounced in the act of June 12, 1837. Franklin *v.* Kessler, 25 Tex., 138.

And in point of fact, as the record now before us shows, titles were extended to the purchasers of these lands long after the period of forfeiture had elapsed. Our courts have construed these laws as having severed the islands from the mass of the public domain, at least to the extent of reserving them from location. The State v. Delesdenier, 7 Tex., 76. From the year 1836 to 1870 this appears to have been the policy of the government concerning the lands on the islands; at least, if there has been any change in the law in this respect, it has not been pointed out. Was there any change wrought in this policy by the act of August 12, 1870? That act, after securing to the citizen upon certain conditions a homestead out of the public domain, provides, by the fifth section, "that the holder of any genuine land certificate, or other valid land claim against the state of Texas, shall hereafter have the right to locate the same upon any part of the public domain of this state not subject to the claim of actual occupants, as prescribed by the foregoing sections of this act, and in accordance with the laws now in force in reference to the location, surveying and patenting of lands in this state." Acts of 1870, pp. 68, 69. The previous legislation concerning the "location, surveying and patenting of lands," generally referred to the public domain other than the islands, and it would seem that full effect could be given to this act without any reference to the islands whatever. Nevertheless, certain locations were made upon Galveston Island under the act, and on the 16th day of May, 1871, its 1st, 3d and 5th sections were so amended as to exclude from its operation the islands and certain other lands. Acts 12th Leg., 1st Sess., p. 93.

By another statute, passed August 19, 1876, the commissioner of the general land office was authorized and required to issue patents upon locations made upon the islands in pursuance of section 5 of the act of August

12, 1870, provided the locations were made between the date of the last named act and the date of the amendment of May 16, 1871, and provides further, that the land so located shall, at some time prior to such location, have been offered for sale by said state." Acts 1876, p. 215. This applies in every respect to the land in dispute in the case before us. It was located by appellee between the date of the act of August 12, 1870, and the date of the amendment of May 16, 1871, and it had been previously offered for sale by the state. What, then, was the effect of these three acts of the legislature upon these lands? We have seen that from an early period they had been severed from the mass of the public domain, and were not subject to location as were the other vacant lands of the state. Was their status so changed by the act of August 12, 1870, as to open them to location? If the ancient policy remained unchanged, then the locations made in 1870 and 1871 would be worthless; otherwise they might be good and valid. Whatever our individual view might be on this subject, we do not feel called upon to express an opinion, as it is not necessary to the decision of this case. For whether the locations were valid or not, they were made within the time specified in the subsequent act; and that act expressly authorized and required the patents to issue. This must be held to validate the locations, and, *prima facie*, to vest in the patentee a good title. Of course we mean a good title as against the state. Putting out of view the rights of third persons, we may even admit that the locations were void; still the legislature had the power to relinquish the land to the locators or to the holders of the certificates; and this, we think, must be regarded as the effect of the statute.

Admitting, then, that appellee's title is *prima facie* good, we come to consider whether it authorized a recovery against appellants in this suit.

What we have already said disposes of the demurrer, the first assignment of error and the propositions under it. The allegations of the petition setting out the title were sufficient.

The decision of one other question will suffice to dispose of the case. The court below appears to have held the pencil entries upon the exhibit annexed to the comptroller's deposition inadmissible because written in pencil instead of ink. This ruling was decisive of the controversy, and, if it was correct, the case is at an end. Our supreme court has held that a note written in pencil is valid. Reed *v.* Roark, 14 Tex., 329. It is also held that documents written in pencil are admissible in evidence (1 Wharton on Ev., sec. 616); and the word "document" applies to a very large class of instruments. We are not aware that this question has ever heretofore been presented to our higher courts for decision, and the authorities upon it are meager.

To sustain the ruling of the court below appellee refers us to the case of Meserve *v.* Hicks, 24 N. H., 295, cited in 1 Greenl. on Ev., sec. 501, note 2 (13th ed.), to the effect that pencil memoranda on records are not admissible in evidence. The same case is cited in 1 Wharton on Ev., sec. 645, to the same effect.

The New Hampshire case is not accessible to us; and we cannot therefore ascertain the grounds upon which it proceeds. But the case of Kerr *v.* Farrish, 52 Miss., 101, resembles very closely the case which we are now discussing.

In that case Mrs. Kerr, widow of James Kerr, sued for a tract of land claimed under her husband, who held a patent from the state. She deraigned title from the United States to Lacoste, by whom, she claimed, the land had been conveyed to the estate for the sinking fund, but no deed could be produced. She presented the official list of lands belonging to the sinking fund, upon which

list was entered the land in controversy with other lands "acquired from Lacoste." Opposite the land in controversy was a pencil memorandum, "Sold to Kerr." The court rejected the evidence, and the supreme court held the ruling erroneous, and reversed the judgment. We are inclined to follow the Mississippi decision, and to hold that the evidence should have been admitted along with the other circumstances of the case.

We say nothing of the character of the Holman title set up by appellants, or of their connection with it, as the matter seems not to have been brought in question in the court below and has not been discussed here.

We have considered the case as it was presented to us, and our opinion is that the judgment ought to be reversed and the cause remanded.

REVERSED AND REMANDED.